**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,

Plaintiff,

v.

Maruice Montgomery,

Defendant.

Case No. 25-cr-251(3) (KMM/SGE)

**REPORT & RECOMMENDATION**

---

This case is before the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1 for a report and recommendation on Defendant Maruice Montgomery's Motion to Suppress Physical Evidence and Statements; Motion to Dismiss Counts 9, 10, and 11; Motion to Suppress Cell Phone Contents; and Motion to Join Co-Defendant Vann's Motion for Disclosure of Confidential Reliable Informants, Sources, and/or Concerned Citizens. (Dkts. 244-247). The Court held a hearing on June 9, 2026. Assistant United States Attorney William Mattessich appeared on behalf of the United States of America. Attorney Margaret Langert appeared on behalf of the Defendant, Mr. Montgomery, who was present at the hearing. The Court heard testimony from Minneapolis Police Officers Michael Selle, Carl White, and Connor Sandahl.

## BACKGROUND

On October 22, 2024, Minneapolis Police Officers Selle and Sandahl were in a marked squad car patrolling the 34th Avenue and Penn Avenue area of North Minneapolis – a purported "hot spot" for violent crime. (Tr. at 12:11-22.) Officer Selle was driving and Officer Sandahl was in the passenger seat. (*Id.* at 52:11-13.) Both officers were assigned to the Southside Community REACT Team, which conducts patrols and traffic enforcement in high crime areas to help deter criminal activity and mitigate violence. (*Id.* at 11:22-12:22, 13:11-18, 51:24-52:2.)

While driving down an alley near a white apartment building considered to be a "trap house,"[1] Officers Selle and Sandahl noticed a maroon sedan leave the parking area of the apartment building and drive into the alley. (*Id.* at 14:5-6; 52:16-20.) According to Officer Selle, the sedan accelerated quickly – too quickly for the gravel-paved road. (*Id.* 14:6-8.) The police car's dash camera video does not show noticeable acceleration by the sedan or that the alleyway was paved with gravel. (*See* GX-1 at 0:00:01-15.)

When the sedan reached the street, the driver failed to signal a left turn or to fully stop before pulling into the roadway. (Tr. at 14:8-10; GX-1 at 0:00:15-20.) The sedan took another turn at the next intersection without stopping at the stop sign or signaling. (Tr. at 14:12-16, 17:20-18:1; GX-1 at 0:00:23-33.) The officers decided to pull the driver over due to the traffic violations. (Tr. at 14:15-17, 18:10-14.) Officer Selle activated his emergency overhead lights and signaled the sedan to pull over. (*Id.* at 18:10-15.) In

---

[1] Officer Selle testified that a "trap house" is a property "known in the community [for] supplying narcotics." (Tr. at 15:8-15.)

response, the driver of the sedan used his turn signal and stopped on the right side of the road. (GX-1 at 0:00:50-0:01:04.)

While still in the squad car, Officer Selle testified he observed the driver of the vehicle moving his arms, slouching in his seat, and looking in the side mirror at him. (Tr. at 18:25–19:1-4.) This behavior raised Officer Selle's suspicions, particularly his belief that the driver's was using the side mirror to "keep[] an eye on" him. (*Id.* at 19:16-18.) Once again, however, the dash camera footage does not corroborate Officer Selle's testimony. The footage shows the driver moving slightly in his seat and looking in the side mirror back at the squad car, but he does not appear to be doing so nefariously. (GX-1 at 0:01:10-30.) Indeed, Officer Selle agreed under cross examination that he, too, uses his side mirror to see what is behind him while driving. (Tr. at 31: 21-24.)

Before the officers pulled the sedan over, Officer Sandahl ran the car's license plate. (*Id.* at 61:8-15; GX-3 at 0:00:30-55.) Officer Sandahl told Officer Selle that the car had "[w]eapons history from this summer." (Gov't Ex. 3 at 0:00:50-55; Tr. at 62:13-20.) At the hearing, Officer Sandahl did not recall the name of the car's registered owner. (Tr. at 61:16-17.) The officers' body camera footage does not include any mention of the registered owner's name during the stop and subsequent arrest. (*See* GX-2, GX-3.) Nor did the officers inquire about the owner's identity. (*See id.*)

Officer Selle asked Officer Sandahl to approach the car from the passenger side for "officer safety," while Officer Selle walked to the driver's side door. (*Id.* at 19:24-20:4; GX-1 at 0:01:29-40; Tr. at 19:14-21.) The driver's window was down, and the driver's hands were on his knees. (GX-2 at 0:01:16-23.) The driver, later identified as Maruice

Montgomery, calmly asked Officer Selle why he was pulled over, and Officer Selle explained the traffic violations. (*Id.* at 0:01:16-39.) Officer Selle then asked Mr. Montgomery for his driver's license. (*Id.* at 0:01:36-43.) Mr. Montgomery said that he was from Mississippi and that he had lost his license.[2] (*Id.*) When Officer Selle asked for proof of insurance, Mr. Montgomery reached to the glove compartment with his right hand. (*Id.* at 0:01:40-50.) Officer Selle testified that when Mr. Montgomery did so, he kept his left elbow "pretty much tucked right to his side the entire time even though ... he [had previously been] using his hands to talk." (Tr. at 20:13-17.) This caused Officer Selle to be concerned that Mr. Montgomery was trying to hide a weapon. (*Id.* at 20:21-21:4.) Despite Officer's Selle's characterization of Mr. Montgomery's left arm placement as "very unusual" and in an "unnatural position," the body camera footage reflects neither. (Tr. at 21:1, 22:16-29; GX-2 at 0:01:45–50.)

Officer Selle then asked Mr. Montgomery to turn the car off, which he did. (GX-2 at 0:01:53-58). Mr. Montgomery explained that he was driving his cousin's car to get food. (*Id.* at 0:02:00-05). Officer Selle again asked for identification and Mr. Montgomery said that he did not have any, but he offered to provide his Social Security number and name. (*Id.* at 0:02:10-18.) Instead of gathering that information, Officer Selle asked Mr. Montgomery to get out of the car. (*Id.* at 0:02:18-20.) He testified that "[a]t that point [he]

[2] Officer Sandahl testified that Mr. Montgomery was "[v]ery evasive in general. Not willing to provide any sort of driver's license or identification." (Tr. at 54:12-15.) This testimony mischaracterizes what is evident from the video footage. Mr. Montgomery did not appear to be evasive, let alone "very evasive." (*See* GX-2.) And Mr. Montgomery was not unwilling to provide identification, he simply did not have any, as he explained to the officers. (*See id.*)

believed [Mr. Montgomery] to be armed, and that was a more safety concern than getting him ID'd."[3] (Tr. at 33:11-19.)

Mr. Montgomery started to get out of the car, then paused and asked what he had done. (GX-2 at 0:02:20-30.) This heightened Officer Selle's suspicion that Mr. Montgomery was carrying a firearm: "When somebody hesitates to remove themselves from the vehicle, many times I've found guns or contraband on them instead of the car." (Tr. at 23:1-14.) Officer Selle also testified, however, that in his experience drivers who are pulled over for traffic infractions can be confused when asked to get out of the car. (*Id.* at 34:9-12.) Officer Selle told Mr. Montgomery that he was going to do a pat-frisk and that he was "a chill dude" and would remain so as long as Mr. Montgomery followed his commands. (GX-2 at 0:02:29-36.) Mr. Montgomery got out of the car. (*Id.* at 0:02:32.) Throughout the encounter, Mr. Montgomery remained calm and cooperative. (*See generally id.*)

Officer Selle then did a pat-frisk for weapons. He unzipped Mr. Montgomery's crossbody bag located on his left side and reached inside. (*Id.* at 0:02:40-48; Tr. at 35:4-7.) The bag contained a lot of change, which made the bag heavy. (GX-2 at 0:02:40-48; Tr. 34:18-20.) Officer Selle next removed the bag from Mr. Montgomery's person and

[3] Officer Selle testified that when a driver does not have a license or proof of insurance with them he usually tries to get photo identification using the "Minnesota systems" or fingerprinting the driver on the scene. (Tr. at 29:21-30:5.) None of this occurred here. (*See id.* at 30:14-16, 63:7-10.)

patted Mr. Montgomery's left side. (GX-2 at 0:02:49-0:03:00). Moments later, Officer Selle said, "There's a gun right here. You're under arrest."[4] (*Id.* at 0:03:00-05.)

Officer Selle testified that when he patted Mr. Montgomery, he felt the "pistol grip" and the "back of the slide." (Tr. at 35:18-22.) In a related court proceeding in Hennepin County, however, Officer Selle testified that he could feel "the imprint of the muzzle, the trigger well, the grip, just the overall shape." (*Id.* at 36:6-10.) Officer Selle explained that a trigger well is a "circular guard" around the trigger and that the muzzle is "where the bullet would exit the firearm." (*Id.* at 36:13-23.) From the body worn camera, it is clear the gun had a guard over the trigger well, making it impossible to feel the trigger well and Officer Selle's testimony from the two hearings about what he felt during the pat-frisk do not match. (GX-2 at 0:03:00-22).

Officers arrested Mr. Montgomery for possessing a handgun without a permit. (Tr. at 37:11-13.) They did not arrest Mr. Montgomery for lacking identification or proof of insurance on the car. (*See id.*) In addition to the gun, police collected $485 in cash, coins from the crossbody bag, and a red iPhone, among other items. (GX-2 at 0:11:00-11:50; Tr. at 37:2-10, 55:12-21.) No identification was found in Mr. Montgomery's effects. (Tr. at 63:18-19.)

Mr. Montgomery was then transported to the Hennepin County Jail for processing. (*Id.* at 56:2-4.) Officer Sandahl accompanied Mr. Montgomery to the jail where they did a search of his person and a body scan. (*Id.* at 56:15-19.) The body scan showed an

---

[4] The officers arrested Mr. Montgomery less than three minutes after pulling him over. (*See* GX-2.)

abnormality, which required jail staff to conduct a strip search. (*Id.* at 57:12-58:8.) Mr. Montgomery was brought to a room to change for the strip search and when he left, staff found suspected narcotics hidden behind a toilet paper roll. (*Id.* at 58:18-21, 61:6-7.) Testing revealed that the substances were fentanyl pills weighing approximately twenty-nine grams. (*Id.* at 59:15-22.)

On October 24, 2024, Minneapolis Police Department Officer Lindsey Kortus applied for a warrant to search the contents of the red cell phone seized during Mr. Montgomery's arrest during the traffic stop. (GX-5.) Relevant here, Officer Kortus attested to the following in the application: (1) Mr. Montgomery "goes by the street name of 'Fresh,'" (GX-5 at 4); (2) the cell phone was seized "pursuant to a narcotics and weapons arrest," (*id.* at 2); and (3) Mr. Montgomery was arrested on October 22, 2024, "during a traffic stop for narcotics and weapons," (*id.* at 4). The warrant was granted the same day. (GX-5.)

The cell phone was given to Minneapolis Police Officer Carl White, a forensic examiner, on October 31, 2024. (Tr. at 42:4-9.) It was stored in the Faraday room, which prevents the cell phone from sending or receiving signals. (*Id.* at 42:25, 49:10-22.) On February 11, 2025, Officer White retrieved the phone from the Faraday room and began his forensic examination. (*Id.* at 44:25-45:4.) Officer White testified that the lengthy delay between getting and examining the cell phone was common given the high volume of cases. (*Id.* at 45:5-15.)

On June 24, 2025, Mr. Montgomery and several others were indicted on narcotics and firearms charges. (Dkt. 1.) A superseding indictment was issued on September 3,

2025, charging Mr. Montgomery with one count of conspiracy to distribute fentanyl, two counts of carrying a firearm during and in relation to fentanyl trafficking, one count of possession with intent to distribute fentanyl, and one count of felon in possession of a firearm. (Dkt. 143.) Mr. Montgomery now moves to (1) suppress evidence obtained from Officer Selle's pat-frisk and the search of the car post-arrest, (2) dismiss Counts 9, 10, and 11 of the Superseding Indictment, (3) void the search warrant; and (4) suppress the contents of the cell phone examination.

## ANALYSIS

### I. Motion to Suppress Physical Evidence and Statements

Mr. Montgomery moves to suppress evidence seized and statements made during the traffic stop and thereafter, arguing that Officer Selle lacked reasonable articulable suspicion to conduct a pat-frisk. He does not challenge the legality of the initial traffic stop based on his driving infractions.

The Fourth Amendment protects against unreasonable searches and seizures, *Terry v. Ohio,* 392 U.S. 1, 9 (1967), and "generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson,* 527 U.S. 465, 466 (1999). "A law-enforcement officer is nevertheless justified in making a limited, warrantless search for the protection of himself or others nearby in order to discover weapons if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous." *United States v. Roggeman*, 279 F.3d 573, 577 (8th Cir. 2002) (citing *Terry,* 392 U.S. at 30). This means that there must be "'specific and articulable facts which, taken together with rational inferences from those facts,' would lead a police officer reasonably to believe the suspect

is 'armed and presently dangerous to the officer or to others.'" *United States v. Glenn*, 152 F.3d 1047, 1048-49 (8th Cir. 1998) (quoting *Terry*, 392 U.S. at 21). "Under this objective standard, the 'officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Roggeman*, 279 F.3d at 578 (quoting *Terry*, 392 U.S. at 27). The Court considers "the totality of circumstances known to the officer at the time of the search." *Glenn*, 152 F.3d at 1049.

The Government argues that Officer Selle had reasonable articulable suspicion to ask Mr. Montgomery to exit the car and to pat-frisk him based on the totality of the following circumstances: (1) Mr. Montgomery was driving in a high-crime area after having left a known trap house; (2) he accelerated and drove erratically when the squad car pulled in behind him; (3) he appeared nervous and evasive after being pulled over; (4) he could not provide identification or proof of insurance; (5) the car he was driving had a weapons history from a few months before; (6) his movements while in the car suggested that he was concealing something with his left arm; and (7) he hesitated when Officer Selle asked him to get out of the car. (Gov't Mem., Dkt. 321, at 10-13.)

The record does not support the Government's position. First, although it is undisputed that Mr. Montgomery was driving in a high crime area, there is no factual support for the contention that he had just left a known trap house. The so-called trap "house" is in fact a three-story apartment building with multiple units. (GX-1 at 11:58:48). The Government has not established whether the entire apartment building, or simply a unit within the building, is considered a hub for drug activity. It stands to reason, though,

that there are likely law-abiding occupants in the building. Thus, even if Mr. Montgomery was in the building – a fact that also has not been established - the officers could not have known whom he visited or for what reason. Notably, they never asked.

Second, Officer Selle's testimony that Mr. Montgomery accelerated down the gravel-paved alley when he noticed the squad car behind him is belied by the dashcam footage. As noted, that footage shows neither notable acceleration nor gravel on the roadway. (GX-1.)

Third, the officers' testimonies that Mr. Montgomery appeared nervous and evasive is likewise belied by the dashcam footage and the officers' body camera footage. As described above, the footage shows that Mr. Montgomery was calm and compliant throughout his interaction with the officers. (*See* GX-2, GX-3.) The footage provides no objective evidence to the contrary.

Fourth, although it is true that Mr. Montgomery lacked a driver's license and proof of insurance, he explained that he lost his Mississippi identification and did not have insurance information because it was not his car. The officers viewed this as an attempt to conceal his identity, but that subjective belief does not match the objective evidence. Mr. Montgomery offered to provide his name and social security number to officers so they could verify his identity. Rather than do so, Officer Selle asked him to get out of the car for a pat-frisk because he had already decided that Mr. Montgomery was a safety risk. The entire interaction took less than one minute.

Fifth, just before the officers approached Mr. Montgomery's car, Officer Sandahl reported that the car had a "weapons history" from the prior summer. Officer Sandahl did

not provide any details about that history or the identity of the car's registered owner. And the officers did not ask Mr. Montgomery about the identity of the car's owner or whether Mr. Montgomery used the car on a regular basis.

Sixth, Mr. Montgomery's left arm placement was not "very unusual" or in an "unnatural position" when he leaned over to the glove compartment to look for proof of insurance. Rather, the footage shows Mr. Montgomery's left arm moving naturally and as a counterweight as he reached to the glove compartment on his right. (GX-2 0:01:40-50.)

Seventh, it was not objectively unreasonable for Mr. Montgomery to hesitate when Officer Selle asked him to get out of the car. The footage shows Mr. Montgomery calmly asking why he needed to get out of the car and then complying. Officer Selle testified that it is not uncommon for drivers to be confused when asked to exit their cars after being pulled over for minor traffic violations. The fact that he sometimes also finds weapons in those circumstances does not mean that he had an objective basis to believe that Mr. Montgomery was carrying one.

The Government is therefore left with the following evidence to support its claim that the officers had reasonable articulable suspicion to conduct a pat-frisk: Mr. Montgomery was driving in a high-crime area near a trap house, he violated traffic laws, the car he was driving was involved with weapons a few months before, and he lacked identification and proof of insurance.

Other than the car's weapons history, the evidence describes "a very large category of presumably innocent" drivers. *United States v. $45,000.00 in U.S. Currency*, 749 F.3d 709, 723 (8th Cir. 2014) (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)). Although

the area in which Mr. Montgomery was driving is a high-crime area that apparently includes trap houses, it is also in a dense urban setting. Most of the people moving in and through that area likely have no connection to criminal activity. As for Mr. Montgomery's traffic offenses, they are common and witnessed almost daily by observant drivers. It is also not uncommon for drivers to not have a license or proof of insurance with them. If these facts are sufficient to provide the foundation for reasonable articulable suspicion, these circumstances would subject innocent drivers to "virtually random" searches. *Id.* (quoting *Reid*, 448 U.S. at 441); *see also United States v. Hull*, No. 15-CR-165, 2015 WL 13731348, at *6 (D. Minn. Dec. 3, 2015) ("[A]n officer's observation of legal but "out of the ordinary" activity which describes too large a category of people is not alone a sufficient basis to develop an individualized suspicion for a traffic stop."). The Court is "mindful of the need to credit law enforcement officers who draw on their own experience and specialized training," but that credit does not outweigh the objective evidence. *Jones*, 606 F.3d at 967-68. "There are limits . . . to how far police training and experience can go towards finding latent criminality in innocent acts." *Id.* at 968 (quoting *Johnson v. Campbell*, 332 F.3d 199, 208 (3d Cir. 2003)).

As to the car's weapon history, the information was several months old when officers pulled Mr. Montgomery over. And, at that point, the officers had not even determined the identity of the car's registered owner. They had no idea who Mr. Montgomery was or whether he was the owner of the car. When asked, he disclosed that the car belonged to his cousin. To prove he had a valid but lost driver's license, Mr. Montgomery offered to provide his name and social security number. But the officers

declined, choosing instead to order him out of the car to be searched. Simply put, the officers lacked particularized suspicion that Mr. Montgomery was personally involved with weapons of any kind, either in the past or that day.

Furthermore, this case stands in stark contrast to the cases the Government relies on to establish reasonable articulable suspicion. *See United States v. Hamdan*, 168 F.4th 1087, 1089 (8th Cir. 2026) (holding that reasonable articulable suspicion existed when the officer pulled defendant over in a high-crime area and knew he was on parole for a firearms offense, was a person of interest in a shooting six months earlier, and was associated with a street gang); *United States v. Campbell-Martin*, 17 F.4th 807, 814-15 (8th Cir. 2021) (concluding that reasonable articulable suspicion existed when the officer observed specific behavior consistent with being under the influence of drugs – nervousness, fidgetiness, rapid speech, constricted pupils, and heavy breathing).

Based on the totality of these circumstances, the Court cannot conclude that the officers had reasonable articulable suspicion that Mr. Montgomery was armed and presently dangerous. As a result, the Court recommends that the firearm and other evidence stemming from the traffic stop – including the red cell phone and its contents and the drugs seized at the Hennepin County Jail – should be suppressed.[5] *See United States*

[5] The Government did not argue that that the firearm and resulting evidence would have been inevitably discovered even if the pat-frisk were to be found unlawful. *Glenn*, 152 F.3d at 1049. Nor could it. The record does not support a finding that Mr. Montgomery would have been arrested (and thereafter searched) without the pat-frisk. The officers could not have arrested him for merely driving without his license in his possession or for the minor traffic violations. Rather, they would have needed to determine that he did not

*v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008) (citation and quotations omitted) ("The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree.").

## II. Motion to Dismiss Counts 9, 10, and 11

The Court recommends that Count 9 (Possession with Intent to Distribute Fentanyl), Count 10 (Carrying a Firearm During and In Relation to Fentanyl Trafficking), and Count 11 (Felon in Possession of a Firearm) should be dismissed because they are dependent on the propriety of the pat-frisk on October 22, 2024.

## III. Motion to Suppress Cell Phone Contents

Because the Court recommends that the evidence be suppressed it need not consider whether the search warrant allowing the search of the cell phone's contents should be deemed invalid due to false statements in the search warrant affidavit.

As discussed, "evidence seized during an unlawful search [cannot] constitute proof against the victim of the search." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). "The exclusionary prohibition extends as well to the indirect as the direct products of such invasions." *Id.* Here, the cell phone contents were derived from the illegal search of Mr. Montgomery. The cell phone would not have been seized and later searched had Officers Selle not conducted the illegal pat-frisk. The firearm discovered during the pat-frisk led to

---

have a valid license at all. *Id.* at 1049-50 (citing Minnesota law). The officers made no effort to do so.

Mr. Montgomery's immediate arrest, which then led to a search of the rest of Mr. Montgomery's belongings, both on his person and in the car. The search of the car yielded the cell phone and later the search of the cell phone's contents. The cell phone contents are therefore "fruit of the poisonous tree" and must be excluded. *Swope*, 542 F.3d at 613.

The Court notes, however, that the search warrant did contain several inaccurate statements. Mr. Montgomery does not go by the street name of "Fresh," (*compare* GX-5 at 4 *with* Dkt. 143, at 1.), the cell phone was not seized pursuant to a narcotics and weapons arrest," (*compare* GX-5 at 2 *with* Tr. 37:11-13); and (3) Mr. Montgomery was not arrested on October 22, 2024, "during a traffic stop for narcotics and weapons," (*compare* GX-5 at 4 *with* Tr. at 37:11-13).

## IV. Motion to Join Co-Defendant's Motion

Mr. Montgomery asks for an order allowing him to adopt Co-Defendant Romelle Vann's Motion for Disclosure of Confidential Reliable Informants, Sources, and/or Concerned Citizens for the sake of efficiency. (Dkt. 247.) Although the motion has been denied (Dkt. 328), the Court will allow Mr. Montgomery to join the motion for purposes of preservation of the issue on appeal.

## CONCLUSION

Based on the file, record, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Physical Evidence and Statements (Dkt. 244) be **GRANTED**;

2. Defendant's Motion to Suppress Cell Phone Contents (Dkt. 246) be **GRANTED**;

3. Defendant's Motion to Dismiss Counts 9, 10, and 11 (Dkt. 245) be **GRANTED**; and

4. Defendant's Motion to Join Co-Defendant's Motion (Dkt. 247) be **GRANTED**.

Dated: August 14, 2026

*s/Shannon G. Elkins*
SHANNON G. ELKINS
United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).